## JOE BARKER v. THE STATE.

No. 3475. Decided March 31, 1915.

**1.—Concealing Stolen Property—Accomplice—Charge of Court.**

Where, upon trial of receiving stolen property, the evidence showed that a certain State's witness was an accomplice, the court's failure to submit a special requested instruction thereon was reversible error.

**2.—Same—Case Stated—Accomplice—Charge of Court.**

Where, upon trial of receiving stolen property, the evidence showed that one of the State's witnesses was with the defendant when the hack was secured in which the stolen goods were conveyed, and that one of the horses hitched to said hack belonged to the witness; that the witness remained with the defendant during the night and was there when the burglars brought the stolen property to defendant's house, got up and made a fire for them, etc., the court should have submitted a requested charge whereby the jury was to determine whether said witness was an accomplice.

**3.—Same—Evidence—Search—Hearsay—Acts and Declarations of Third Parties.**

Upon trial of receiving and concealing stolen property, it was reversible error to admit testimony that some twelve months after the burglary during which the alleged property was stolen, the officers were informed, by a party who was not placed on the witness stand, that a certain article had been stolen from said burglarized house and that such article was at defendant's house, and that, thereupon, the officers went to said house and made a search, without informing either defendant or his wife of their purpose, testifying to all the details of said search and finally finding a similar article in a trunk, it being an issue whether said article belonged to the wife of the defendant or the alleged owner of the stolen goods, there not being sufficient evidence to show that it was the latter's property; besides, the testimony as to the details of such search were clearly inadmissible.

Appeal from the District Court of Williamson. Tried below before the Hon. C. A. Wilcox.

Appeal from a conviction of receiving and concealing stolen property; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Ramsey, Black & Ramsey,* for appellant.—On question of failure to submit charge on accomplice testimony of the witness Haller Ford: Hines v. State, 27 Texas Crim. App., 104; Armstrong v. State, 33 Texas Crim. Rep., 417; Williams v. State, 33 id., 128; Minter v. State, 70 Texas Crim. Rep., 634, 159 S. W. Rep., 286; Holmes v. State, 70 Texas Crim. Rep., 214, 156 S. W. Rep., 1172; Hyde v. State, 165 S. W. Rep., 195.

On question of admitting testimony as to search, etc.: Richards v. State, 59 Texas Crim. Rep., 203; Anderson v. State, 14 Texas Crim. App., 49; Cannada v. State, 29 id., 537.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of receiving and concealing stolen property, knowing it was stolen, and his punishment assessed at two years confinement in the penitentiary.

The State's evidence would show that H. M. Davis, Johnny Davis and Earl Decherd conceived the idea of burglarizing the house of Mrs. Nannie Dieckman, located at Elgin, in Bastrop County, and the record clearly discloses that her house was broken into and the property alleged to have been stolen was stolen therefrom. H. M. Davis says that after he and Johnny Davis and Earl Decherd had agreed to burglarize the house, he went back to Coupland, in Williamson County, and told appellant Barker about the matter, and asked him if he wanted the things they were going to steal, and appellant replied that he did. He says he told appellant then to send a hack to Elgin that night by some negroes on Barker's place after the things. He says he then went back to Elgin, and that night three negroes came to Elgin in a hack. That Johnny Davis went up and opened the house of Mrs. Dieckman, and he, H. M. Davis and Earl Decherd and the negroes went up there, burglarized the house and placed the stolen articles in the hack. The negroes then drove off in the hack, and he and Decherd went to bed in a room over a saloon. The next day he, Davis, went on the train to Taylor, and Mrs. Barker coming to Taylor from Hutto, he and Mrs. Barker drove out to appellant's house in a buggy brought to Taylor by a negro for Mrs. Barker, and that when he got to appellant's house he saw the stolen property there in the house, and that it remained there until the next day, when Barker (appellant) moved it to a vacant house on the farm, and then afterwards told him he had sent it to his mother-in-law's at Hutto.

If, as H. M. Davis says, appellant was told that the Mrs. Dieckman house was going to be burglarized, it appears from the record that he then went to Coupland; that while at Coupland Hugo Franze says that some of the negroes living on the Barker farm wanted a hack, saying they were going to Manor; that he and appellant were in the pool hall; that the negroes did not have the money to pay for it, and wanted appellant to stand for it, and appellant told him to let the negroes have the hack. This brings us to one of the most serious questions in the case. Appellant had only one horse there at Coupland. Haller Ford, who lived in about four hundred yards of appellant, was there in Coupland, and also had a horse. Appellant's horse and Ford's horse were hitched to the hack, and appellant, Ford and the negroes got in the hack and drove to appellant's house, when he and Ford got out and the negroes were told to take the horses to the barn, some three hundred yards distant, and feed them. Appellant and Ford went to bed, and, according to the record, that night about 2 o'clock they were awakened by someone calling appellant. Ford says appellant complained of being sick was the reason he stayed with him that night, and when they were awakened that night he opened the door and three of the negroes living on Barker's place were there and said they were cold; that at appellant's request he made a fire, and appellant told the negroes to come in and warm. That when the negroes came in the house they told appellant they "had some stuff from Elgin," and appellant told them to bring it in; that the negroes brought in some chairs, rugs,

quilts, silverware, glassware and other things; that appellant told him there was some wine in an adjoining room, and asked him to go and get it and give it to the negroes. They both then went to bed and Ford left the next morning, and says he has never seen any of the things since then. Ford's testimony would show that he knew nothing about the burglary going to take place, and that he stayed with appellant that night because appellant complained of being sick (Mrs. Barker being absent), and that he was a mere innocent "bystander."

Appellant's contention is, that the facts and circumstances in the case raise the issue that Haller Ford was an accomplice, if he was guilty of receiving and concealing stolen property, and that the court erred in not giving his special charge submitting that issue to the jury.

As before said, if we accept Haller Ford's testimony as true, it would show him, while present when the stolen goods were received, to be merely an innocent spectator. On the other hand, if the State was prosecuting him for being a principal in the commission of the offense (if appellant was guilty of receiving and concealing stolen property), what would the evidence disclose? It would show that Haller Ford was with appellant when the hack was secured from Franze by the negroes; that his horse and appellant's horse were hitched to the hack; that he and appellant drove the hack to appellant's house, when it was turned over to the negroes; that he and appellant went to bed together, and that night about 2 o'clock the negroes came back to this house, when Haller Ford got up, made a fire and opened the door for the negroes to come in. The negroes then said to appellant, in his, Ford's, presence, that "they had some stuff from Elgin—that it was from a widow woman's place in Elgin:" That it was then brought in in his presence and he saw what it was; that at appellant's request he got some wine and gave it to the negroes.

Now if Haller Ford was being prosecuted jointly with Barker for receiving the stolen property, and, under a proper charge, on this evidence was found guilty, would we hold, as a matter of law, that the facts and circumstances were insufficient to sustain a conviction? If so, then perhaps the testimony does not raise the issue of whether or not Haller Ford was an accomplice. If, on the other hand, we would sustain such a verdict, if found by a jury, then the facts and circumstances clearly raise the issue of whether or not he was an innocent bystander, or whether he was a guilty participant, if Barker is guilty. We are of the opinion that the facts and circumstances raise the issue, and the court should have given the charge requested by appellant submitting the question to the jury of whether or not Haller Ford was an accomplice. To our minds it is hardly reasonable to believe that a sane man, knowing that a burglary was going to be committed that night, and the stolen property brought to his house, would invite a friend to go home with him, sleep with him in the same bed, and when the thieves brought the property in the dead hours of night, ask the friend to make a fire, turn on the lights, and then open the door and tell the thieves to bring in the stolen property, and receive it in

his presence. The most natural thing, to our minds, would have been for him, under such circumstances, to have tried to keep his friend from seeing the stolen property. Instead of asking his friend to get up, make a fire and open the door and tell the thieves to come in, if his friend knew nothing he would have asked his friend to lie still, and would have gone to the door and told them that Haller Ford was there in the room and it would not do to bring the stolen articles in there— to carry it somewhere else.

Another bill, we think, presents error. It appears that some twelve months after the robbery the officers were informed by Earl Decherd that a little teddy bear had been stolen from Mrs. Dieckman's on the night of the burglary, and that there was a little teddy bear at the home of appellant. W. C. Rutherford testified that he had a talk with Earl Decherd, and then went to Taylor, where he was joined by Sheriff Allen and his deputy, Mr. Grimes. He says they got a search warrant and went to appellant's farm. They met appellant on his way to the field and said nothing to him, but went on to the house, and when they got to the house no one was there except Mrs. Barker and a negro woman, who was ironing. They said nothing to Mrs. Barker about their mission, but at once began to search the premises. He then testifies: "We went there to look and search for a particular thing. We went in the house and made a search. The first place I looked was in a safe. We did not find what we were looking for. I looked into a closet where they kept some dishes, back in the corner of the kitchen; then I left the kitchen and went into a bedroom, in the front room, and I looked into a washstand; that was the third place I looked; then I looked between the mattress and the bed springs; then I looked in a trunk, was the last place I looked. With reference to the article now handed me, I have seen it before; I found that in the bottom of the trunk. (The article referred to is a china 'teddy bear' about four inches in height, a portion of the bottom of the same having been broken.) I took this 'teddy bear' from there to Elgin. I carried it to the justice of the peace first and turned it over to him, and then I showed it to Mrs. Dieckman."

In regard to this "teddy bear," Mrs. Dieckman testified that she had one something like it—that it set on a dish and was the same size as this one; that it is the same kind of ware and similar in color. That she could not see any difference in this one and the one she had.

When the "teddy bear" was introduced in evidence appellant called Miss Effie Loden, who testified that she was a cousin of appellant, and that she owned one just like it and had given it to Mrs. Minnie Barker, wife of appellant, explaining the circumstances. Mrs. Lucy Barker testified that she was the wife of a brother of appellant, and that she was present when Miss Loden had given appellant's wife a "teddy bear" like the one introduced in evidence, and that she had afterwards seen it at her home. The wife of appellant, Mrs. Minnie, Barker, also testified that the "teddy bear" had been given her by Miss Loden, and the "teddy bear" taken out of her trunk by Mr. Rutherford

was the one given to her by Miss Loden. It is thus seen that the issue was sharply drawn as to whether or not the "teddy bear" Mr. Rutherford got out of the trunk of appellant's wife was the "teddy bear" stolen from Mrs. Dieckman, or the one given to Mrs. Barker by Miss Loden—the State contending that it was the one stolen from Mrs. Dieckman on the night of the burglary, and if this was true it would be a strong circumstance to show that appellant had received the stolen goods. Appellant, on the other hand, contending that the toy was given to his wife by Miss Loden. With this issue in the case, appellant objected to the State being permitted to prove by Mr. Rutherford that he *talked with Earl Decherd,* and then he and Decherd and Sheriff Allen and Deputy Sheriff Grimes went to Barker's house *in search for a particular thing;* that they looked in the safe; in the closet; in the kitchen; in the washstand; between the mattress and bed springs, and then in the trunk, where he found the "teddy bear"; that he took it and showed it to Mrs. Dieckman, making it plain that the "teddy bear" was the particular thing he went to appellant's house to look for after his talk with Decherd. This testimony necessarily conveyed to the jury the idea that Earl Decherd had told him he would find a "teddy bear" at the home of appellant, and that it was the one stolen by himself and the two Davis men and the three negroes from the house of Mrs. Dieckman. Earl Decherd was not called as a witness by the State. The State had not undertaken to prove by the other confessed thief, who was introduced as a witness (H. M. Davis) that a "teddy bear" was taken by them and carried to appellant's house, but indirectly it was proven by Mr. Rutherford that he had been so informed by Earl Decherd, and he took him and went to appellant's house and searched until he found a "teddy bear," and he carried it and showed it to Mrs. Dieckman. This is the necessary and legitimate conclusion from his testimony. It was permissible for the State to show that the officers had been informed that a "teddy bear" had been stolen from Mrs. Dieckman, and that such an article had been found at the residence of appellant, and to properly identify the toy introduced in evidence as the one found at appellant's house; and then to prove by admissible testimony that it was the toy taken from Mrs. Dieckman's house, if it could do so, but it was improper to permit the State to introduce those inadmissible matters to prove that fact. It was unnecessary for the officer to detail what a minute search he made, but he could and should have been permitted to say that he found it in the trunk where he said he found it. His minute description of the search made by him, when he had not called on appellant or Mrs. Barker to know if they had a "teddy bear" in the house, conveyed the impression that he thought they were trying to conceal it, when there is no other testimony in the record to show such to be the fact. If the testimony clearly showed this to be one of the stolen articles, such testimony would not be so hurtful, but this is a contested issue, Mrs. Barker explaining where she got the toy, and why she had put it in the trunk. She testifies that Earl Decherd had been at her house during the year between the time

the burglary occurred and the time the search was made, and thus had an opportunity to see the "teddy bear" at her house. We think on another trial the State should be restricted to proof that upon information received they had found the "teddy bear" at Mr. Barker's in his wife's trunk; then prove the identity of the one introduced in evidence as the one found; then legitimate proof as to whether or not it was the one taken from Mrs. Dieckman's on the night of the burglary, and the State should not be permitted to aid the testimony on that issue by getting in evidence indirectly that Earl Decherd had told the officers they would find the "teddy bear" taken from Mrs. Dieckman's at the home of appellant, nor give in evidence the minute search that had to be made to find the "teddy bear" that was found, when no demand had been made on appellant or his wife to know if they had such an article in their house. If they had informed them, or either of them, they were in search of a china "teddy bear," it might have been produced at once, and, if so, the fact it was in a trunk would not have been a circumstance against them.

The other questions in the record we do not deem it necessary to discuss.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*